Per Curiam :
This is the third time the claim set forth in paragraph 18 of plaintiffs’ multi-claim petition has come before us. In Confederated Salish and Kootenai Tribes v. United States, 181 Ct. Cl. 739 (1967), we held that a proper claim had been stated on the pleadings. In Confederated Salish and Kootenai Tribes v. United States, 189 Ct. Cl. 319, 417 F. 2d 1340 (1969), after a trial, we returned the case for a full new trial, and set forth in our opinion what plaintiffs would have to show in order to recover. The second trial was had before Trial 'Commissioner Harry E. Wood who has filed a report recommending that the claim be dismissed as unproved. After hearing oral argument and considering the briefs of the parties and the amici curiae, we agree with the trial commissioner and adopt his opinion, findings of fact (with a few modifications), and recommended conclusion. His opinion, wMch follows the directions in our decision in 189 Ct. Cl. 319, 417 F. 2d 1340, and which we adopt, is set forth in Part One of this opinion. We also discuss, in Part Two, infra, certain issues, stressed before us by the plaintiffs, which they contend the commissioner neglected; our holding is that these matters do not require any revision in the commissioner’s conclusion.
Part One
OPINION OF COMMISSIONER
In this claim, one of several brought under a special jurisdictional act,[1] plaintiffs allege that under the provisions of Federal Power Commission License No. -5, Montana, issued in 1930 to the Kocky Mountain Power Company, which license included the use of tribally-owned Flathead Site No. 1 in connection with the licensee’s power project on and along the Flathead Piver and Flathead Lake, defendant required the licensee to make available, and to sell to the federally-sponsored Flathead Irrigation Project on demand, a block of *603 ■power [2] at less than the fair and reasonable market value of suck power; that the “total rentals from said license for use of Indian lands” are not being .paid to them; and that defendant has thereby appropriated plaintiffs’ property in breach of its fiduciary obligations to them.
For reasons which follow, it is concluded that plaintiffs are not entitled to recover on this claim.
I
Following trial, in 1968, of the claim stated in Paragraph 13, the court held that plaintiffs’ proof, directed solely to the value of the power made available to the Flathead Irrigation Project pursuant to the terms of License No. 5, Montana, did not “jibe with the applicable rule of damages.”[3] Confederated Salish and Kootenai Tribes v. United States, 189 Ct. Cl. 319, 322, 417 F. 2d 1340, 1341 (1969). The correct test, the court ruled, was “what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license.”
For reasons stated,[4] the court remanded this claim for new trial, “vacating the prior commissioner’s opinion and findings *604 so that the parties cam start afresh and direct their presentation to the correct measure of damages.”[5] In so doing, the court stressed that:
* * * we are in no way holding that plaintiffs have yet proved any loss * * *. The issue of the existence of a loss, as well as of the amount, remains to be tried again. To recover, plaintiffs must prove that a supposititious willing buyer desiring to develop the site for power purposes, and able to obtain the necessary license, would have paid, and a willing owner would have accepted, a higher rental than the amount actually paid, if the former had not been burdened with the necessity to sell at the prescribed rate the block of 15,000 horsepower to the Federal Government, and then the plaintiffs must show the probable amount of that excess.
II
The history of the development of Flathead Site No. 1 (now known as Kerr Dam), detailed in the accompanying findings of fact, extends far into the past. And, the breadth, and implications, of certain of the contentions here advanced, particularly by defendant and amici curiae,[6] suggest that decision respecting some of them might have impact extending beyond both the present time and the present forum. Neither lengthy historical exploration nor consideration of many of the issues raised by the parties (and by amici curiae) is, however, essential to decision on the claim stated in Paragraph 13.
III
The pivotal issue here is “what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license.”[7] As defendant correctly urges, this necessitates inquiry (1) whether or not a “supposititious willing buyer” *605 would have anticipated an annual loss in consequence of the requirement for furnishing 15,000 horsepower to defendant at prescribed rates, and (2) even if so, whether or not such an anticipation of loss would have had any depressive effect upon rentals otherwise payable to plaintiffs. Plaintiffs’ argument that the “sole issue is * * * the amount of the cost-loss, if any, incurred by the Company * * *” in consequence of that requirement is plainly untenable.
At trial on remand, the questions stated above were explored, with the aid of expert witnesses, in some depth. The testimony of plaintiffs’ expert is summarized in finding 41. That of defendant’s experts is summarized in finding 42.
Plaintiffs’ expert expressed no opinion of his own as to the amount of annual loss (if any), to a prospective licensee, realistically attendant upon the requirement for furnishing power to defendant at prescribed rates. The thrust of his testimony was, rather, that the Pocky Momitain Power Company’s estimate of the annual loss which would result from furnishing power to defendant pursuant to the terms of the subsequently issued license was “more logical and realistic”, and was “a better measure of that loss”, than the Scattergood computation.[8] Given cle'ar opportunity to do so, he declined to endorse either estimate as an accurate measure of the cost of what a licensee would “[have] to give up * * *” in consequence of the presently relevant terms of License No. 5, Montana. This gap in the proof is striking, and significant.
In contrast, defendant’s experts were of the view that no loss would have resulted from such terms, and that, on proper analysis of all of the information actually available in 1929-30, any prospective licensee should have concluded that the cost of furnishing such power would be less than the revenues to be derived therefrom, taking pertinent factors into consideration.
Defendant’s experts were, moreover, of the opinion that in any event any loss anticipated by a prospective licensee could and would have been passed on in full to the licensee’s ratepayers, and thus would have had no adverse economic im *606 pact on either the licensee or Indian rentals.[9] They saw no relation between any such anticipated loss and the amount of rentals payable to plaintiffs.[10]
Weighing the conflicting evidence, plaintiffs clearly do not have the better of the proof. And, the burden is theirs. The result is considerable impact on plaintiffs’ argument that “a licensee not burdened with the bargain power requirement would have paid rentals higher by the amount which it estimated the requirement would cost it”, and that they have established that “cost.”
Upon consideration of the expert opinions adduced at trial and the remainder of the record, it is concluded that plaintiffs have failed to prove by a preponderance of the evidence that a prospective licensee would have anticipated an annual loss in consequence of the requirement for furnishing the 15,000 horsepower to defendant at prescribed rates, or, assuming a prospective licensee would have anticipated an annual loss in consequence of such a requirement, that the anticipation of loss would have diminished the rentals payable to plaintiffs but for the said requirement.[11]
In sum, plaintiffs have not met their burden of proof. Accordingly, as to the claim, stated in Paragraph IS, the petition should be dismissed.
Part Two
Plaintiffs fault the trial commissioner’s opinion, supra, for failing, in their eyes, to consider adequately the 'fiduciary relationship of the Federal Government toward these Indians with respect to the use of their land for power purposes. This argument, much emphasized before the judges, is as follows: (1) In negotiating with the company on the terms of the license and the compensation for the Tribes, the United *607 States was subject to trust obligations toward the Tribes; (2) during the negotiations, the United States had conflicting interests revolving around its concern for the irrigation project and, because it insisted on obtaining cheaper power for the project, may well have failed to protect the rights of the Indians by achieving the level of rentals for the Indians which would have otherwise been obtained; (3) since the United States breached its fiduciary duty by seeking special rights for the irrigation project at the expense of the Tribes, the defendant has the burden of showing that the plaintiffs suffered no loss from this breach, rather than the burden of showing loss being on the plaintiffs — citing Navajo Tribe v. United States, 176 Ct. Cl. 502, 507-08, 509, 364 F. 2d 320, 322-23, 324 (1966); and (4) there is sufficient evidence that the Indians necessarily suffered loss through the breach, and the defendant has failed to overcome that proof. In the ensuing discussion, we deal explicitly with this chain-of-reasoning, all of which stems from the basic charge of breach of trust.
From the start we assume with plaintiffs that the Federal Government had trust obligations toward them in negotiating and establishing the terms of the license. Our difficulty is that we fail to see the breach of that obligation — in the sense of a conflict of interest or other failure to observe the highest standards of conduct toward the beneficiary — which the Tribes so urgently press upon us. The alleged conflict of interest is said to arise from the Government’s keen interest in recouping the $6,000,000 it had paid toward the irrigation project, and its insistence on low rates in order to help the project pay back that sum. To this is added (as well as lesser items) the statement by the company at the Power Commission hearing in 1929 that its out-of-pocket loss in furnishing cheaper power to the irrigation project would be $62,500 a year; the computation by Assistant Commissioner of Indian Affairs Scattergood that this loss would be only $25,336 per year; and testimony in 1929 by the company’s president which plaintiffs understand as admitting that it “is simply a matter of figures” that the company (as licensee) could and would pay more to the Indians by way of rentals if it *608 did not have to furnish, the power to the reclamation project. From these (and some other) materials plaintiffs conclude that the position of the Federal Government was infected by a serious conflict of interest and by failure to pursue the Indians’ interests as loyally as it should have.
Our study of the record leads us to the opposite conclusion — that there was no conflict of interest and no violation of fiduciary obligations by the Government. The chief negotiator for the United States, with respect to the tribal land, was Assistant Commissioner Scattergood. He authored two memoranda in 1929 and 1930 which carefully set out in detail the various factors bearing on the monetary terms of the proposed license. These documents show that Mr. Scattergood (and through him the Federal Government) was at great pains to preserve fully the Indians’ interests and did not in any way allow the Government’s concern with the needs of the irrigation project to detract from full protection of the tribal rights. The reports expressly state, repeatedly, that the amount and character of the Indian rentals were first considered on their merits wholly apart from the problem of cheaper power for the irrigation district.[12] The format and contents of the reports, which go fully -and in great *609 detail into all aspects of the problem, affirmatively bear ont this deliberate representation, and we accept it as accurate. The remaining parts of the record, moreover, do not detract from this conclusion.[13] We are satisfied, therefore, that the Federal Government did not, in the thinking of its agents, subordinate the Indian interests to those of the reclamation project at the time of the negotiations for the license.
Plaintiffs argue, however, that, whatever Mr. Scattergood and the other federal representatives may have subjectively thought, they necessarily and inevitably subordinated the Indians’ interests by failing to seek and obtain higher rentals once the company said that it would suffer a substantial loss in supplying the cheaper power to the irrigation district. The underlying assumption is, of course, that the company could and would pay higher compensation to the Indians if it were relieved of the obligation to furnish the irrigation electricity — and that the federal representatives should have realized this to be the fact.
*610 There are at least two mortal defects in this essential postulate of plaintiffs’ contention. The first is that there is very-good reason to doubt that the company really considered that it would suffer any such out-of-pocket loss; it may very well have made the assertion simply for bargaining and tactical purposes. The Scattergood report carefully whittles down any possible loss from $62,500 a year to $25,836 by showing the inflated and contrary-to-f act assumptions on which the company’s statement was rested. This analysis indicates the unlikelihood that the prospective licensee put much stock in the higher figure it had put forth. The expert testimony at the trial before Commissioner Wood likewise supports this conclusion. Even the lesser Scattergood figure leaned heavily on the conservative side and did not take account of all significant factors.
Second, it seems that the company probably understood full well that any potential out-of-pocket loss on the sale of the irrigation power could and would be readily made up from other sources without affecting the Indian rental. The original intimation of the company’s representative (Mr. Kerr) that it “is simply a matter of figures” that the company could pay more to the Indians if it did not have to furnish the reclamation power was severely limited in later testimony by the same Mr. Kerr at the Federal Power Commission hearing to the points that “it might be argued” that the Indian rental would be affected and that the cost of the irrigation power over the 50-year license “is a very debatable question.” Mr. Scattergood considered that the company could recoup any possible loss by passing it on to the general consumer,[14] and in addition his second report observes (see note 12, supra) that “[i]t was recognized by the company’s representatives, 'as well 'as by those representing the Government, that at Thompson Falls there will be developed, because of Flathead storage, more than twice as many additional kilowatt-hours than can possibly be used in the entire irrigation 15,000 horsepower demand. Hence, the delivery of this power can and will be provided without the slightest effect in reducing the Indian rental.” The reason *611 able inference is that tb.e power company knew itbat the matter of furnishing the cheaper electricity to the project was separate and independent from the negotiation of the Indian rental. There was no inevitable or automatic connection between the two, and the Federal Government was under no mandate to 'assume that the company woxdd probably pay more if relieved of the irrigation-power obligation.[15]
We conclude, therefore, that the Federal Government did not breach its fiduciary duty to the Indians, either subjectively or objectively, in dealing with the company. The Government did not misbehave — i.e., did not subordinate the plaintiffs’ interest to its own or fail to protect fully the Indians’ interest or use the Indians’ property for its own purposes — in seeking the ¡power for the irrigation district. Our affirmative finding is that the Government was free from such a taint.
On that finding the foundation of the argument plaintiffs stress before us is shattered, and we are left to consider the plaintiffs’ claim apart from any infection by conflict of interest or breach of trust. The rule of the Navajo Tribe case, imposing special requirements and allocation of burden of proof where the Government has definitely breached, or in all probability has broken, its trust obligation, is inapplicable to the present situation. This case must be viewed, rather, as a normal Indian claim in which the claimant has the burden of showing that it has received less than its entitlement — in this instance, the full “rentals from such [waterpower] licenses for use of Indian lands” which the *612 Act of March 7, 1928, supra, declared “shall be paid the Indians of said reservation as a tribe.” See Confederated Salish and Kootenai Tribes v. United States, 181 Ct. Cl. 739 (1967).[16] Put another way, the problem before the court is the same as if the plaintiffs’ land were not held in trust but was owned by them outright, and they were claiming, as here, that the rentals established in the license did not fully compensate them for the power value of their property.
Accordingly, Commissioner Wood was entirely correct in posing the question as whether plaintiffs have met their burden of proof of showing a loss in that they have received loss than the full statutory “rentals” Congress mandated. And, as we have already indicated, we think he was also correct in determining that plaintiffs failed in meeting that burden. On that point we need add nothing significant to his opinion (see Part One, supra)[17] or to the findings infra.
Conclusion
For the reasons given by the trial commissioner (Part One, supra), as augmented by Part Two, supra, and on the basis *613 of our findings of fact, we conclude that plaintiffs are not entitled to recover on the claim stated in paragraph 13 of the petition and we dismiss that paragraph.
FINDINGS or Fact
The court, having considered the evidence, the report of Trial Commissioner Harry E. Wood, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) This claim (Paragraph 13 of the petition) is one of several before the court pursuant to the Act of July 30,1946, 60 Stab 715, conferring jurisdiction upon the court “to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims of whatsoever nature which the Confederated Salish and Kootenai Tribes of Indians of the Flathead Reservation of Montana, or any tribe or band thereof, may have against the United States.”
(b) In 1930, Federal Power Commission License No. 5, Montana, was issued to the Rocky Mountain Power Company by the Federal Power Commission. The said license included the Company’s use of a power site (Flathead Site No. 1) on plaintiffs’ land in the Flathead Indian Reservation in connection with the Company’s power project on and along the Flathead River and Flathead Lake. The claim in Paragraph 13 is that, under the provisions of the said license, defendant required the Company to make available, and to sell to the federally-sponsored Flathead Irrigation Project on demand, power at “less than the fair and reasonable market value of said power”; that “the total rentals from said license for use of Indian lands” are not being paid to plaintiffs; and that defendant has thereby appropriated plaintiffs’ property, in consequence entitling plaintiffs to just compensation.[1]
(c) In Confederated Salish and Kootenai Tribes v. United States, 181 Ct. Cl. 739 (1967), defendant’s motion for sum *614 mary judgment on the claim stated in Paragraph, 13, on the grounds (1) that plaintiffs had “no compensable right to the power value of land utilized for licensed power facilities”, (2) that a 1948 Congressional enactment “ — giving $400,000 to the plaintiffs — constitutes a full settlement of this claim”, and (3) that plaintiffs had in any event “suffered no loss by reason of the low rates to the irrigation project”, was overruled, the first two defenses being rejected “on their merits”, and the third being “remanded for trial.”
(d) In Confederated Salish and Kootenai Tribes v. United States, 189 Ct. Cl. 319, 417 F. 2d 1340 (1969), the court held that plaintiffs’ proof at trial of the claim stated in Paragraph 13 (directed solely to the value of the power made available to the Flathead Irrigation Project under the license) did not “jibe with the applicable rule of damages”, and that the “correct test * * * is what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license.” The court, with one judge dissenting, vacated “the prior commissioner’s opinion and findings”, and remanded the case for new trial directed “to the correct measure of damages.” [2]
(e) A further trial was held in Washington, D.C., July 28-29,1970. Briefing was completed November 1, 1971. At such trial, plaintiffs, properly recognizing that the commissioner is bound by the court’s order of remand, endeavored to establish a lost “rental value” of Flathead Site No. 1 within, the confines of the court’s 1969 opinion. Plaintiffs’ Requested Findings of Fact on Rehearing, pp. 169-70. Plaintiffs still “disagree with the Court” as to the proper measure of damages, however, and “preserve their prior position” on this question. Id., pp. 7,169.[3]
*615 2. (a) By the Treaty of Hell Gate, July 16, 1855, 12 Stat. 975, the Confederated Salish and Kootenai Tribes ceded to the United States a vast area of land, located within the present borders of the States of Montana and Idaho, theretofore held by aboriginal title.
(b) Article II of the Treaty of Hell Gate reserved from the lands ceded a tract of some 1,245,000 acres in northwestern Montana,
All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes as an Indian reservation. * * *
The tract so reserved became known as the Flathead Indian [Reservation.
3. (a) The Flathead Indian Reservation of Montana is located in the Northern Rocky Mountains, just west of the Continental Divide. In broad terms, the northern boundary of the Reservation (from east to west) bisects Flathead Lake, a large body of navigable water some 30 miles long (north to south) and some 20 miles wide at its greatest width (within the lower or south half of the lake and within the Reservation).
(b) The waters of Flathead Lake are discharged, at its southern extremity, into the Flathead River, which then traverses the Reservation in a southerly direction until it reaches the present-day town of Dixon, Montana, at which point it flows generally west until it joins with the Clark Fork River to form the southwestern corner of the Reservation. There are, within the Reservation, five valuable hydroelectric sites on the Flathead River south (or west) of Flathead Lake. Flathead Site No. 1 is about 4 miles below “the present [Flathead] lake outlet”; the other four sites are, respectively, some 5, 12, 39, and 43 miles below Flathead Site No. 1.
4. Following abortive efforts by defendant to negotiate with plaintiffs for the cession of portions of the Flathead Indian Reservation, the Act of April 23, 1904, 33 Stat. 302, providing for “the survey and allotment of lands now embraced within * * * the [said] Reservation * * * and the *616 sale and disposal of all surplus lands after allotment” was passed. A broad survey of the allotment and disposition provisions of the 1904 Act appears in Confederated Salish and Kootenai Tribes v. United States, 193 Ct. Cl. 801, 829-34, 437 F. 2d 458, 474-76 (1971). Briefly, and in general (but presently sufficient) terms, the Act provided that after survey of the Reservation and allotments to all members of the Tribes, the unallotted lands were to be classified and appraised by a Commission, and that certain of the said lands were then to be opened to settlement and entry by proclamation of the President.
5. Section 14 of the 1904 Act provided that the proceeds of the “sale of said lands” would be paid into the Treasury of the United States and, after certain deductions, would be expended or paid as follows: one-half for the benefit of “the said Indians * * * in the construction of irrigation ditches, the purchase of stock cattle, farming implements, or other necessary articles to aid the Indians in farming and stock raising, and in the education and civilization of said Indians * * with the “remaining half to be paid to the said Indians * * * or expended on their account, as they may elect.”
6. Section 19 of the 1904 Act, as added by the Act of June 21, 1906, 34 Stat. 325, 355, provided:
That nothing in this Act shall be construed to deprive any of said Indians, or said persons or corporations to whom the use of land is granted by the Act, of the use of water appropriated and used by them for the necessary irrigation of their lands or for domestic use or any ditches, dams, flumes, reservoirs constructed and used by them in the appropriation and use of said water.
7. On November 12,1907, a project engineer, United States Reclamation Service, Department of the Interior, submitted to the supervising engineer, United States Reclamation Service, a “report outlining the possible irrigation systems ■and power development on the Flathead Indian Reservation * * The report reflected that “in general 78,000 acres [of Reservation land] can be irrigated bj’’ gravity and 57,000 acres by pumping schemes”; that the water power of the *617 Flathead River “would amount to 180,000 horse power, of which 21,000 horse power might be used for irrigation pumping” ; and that a large power development, aggregating possibly 100,000 horsepower, was “possible on the different small streams used for irrigation * * It also stated in part (albeit without citation of authority) that “The power at the falls of the [Flathead] has already been reserved by the Government in pursuance of a wise policy of public use of this great power * * *”, and that “To protect the people and the Government in this great development so that speculation and private greed shall not dissipate or control such magnificent natural conditions it is recommended that the forests which cover the mountain sides and include the water power sites and the drainage areas, be kept withdrawn from settlement or pre-emption without restriction by private parties.”
8. By the Act of April 30, 1908, 35 Stat. 70, 83-84, Congress appropriated $50,000 for preliminary surveys, plans and estimates of irrigation systems to irrigate both lands allotted to the Indians of the Flathead Indian Reservation and unallotted lands to be disposed of pursuant to the Act of April 23, 1904, supra “and to begin the construction of the same, * * * the cost of said entire work to be reimbursed from the proceeds of the sale of the lands within such reservation.” [4]
9. Shortly thereafter, by Section 15 of the Act of May 29, 1908, 35 Stat. 444, 448-50, Congress amended Sections 9 and 14 of the 1904 Act.
Section 9, as enacted in 1904, had provided in part that “said lands shall be opened to settlement and entry by proclamation of the President * * *”; that the price of the said lands “shall be the appraised value thereof, as fixed by the said commission * * *,” to be paid “one-third * * * in cash at the *618 time of entry, and the remainder in five equal annual installments, to be paid one, two, three, four, and five years, respectively, from and after the date of entry * * and that homestead settlers might commute “their entries * * * by paying for the land entered the price fixed by said commission, receiving credits for payments previously made.” By the 1908 amendment to Section 9, Congress (inter alia) added to the foregoing provisions the following ones:
* * * Provided, however, That the entryman or owner of any land irrigable by any system hereunder constructed under the provisions of section fourteen of this Act shall * * * be required to pay for a water right the proportionate cost of the construction of said system in not more than fifteen annual installments, as fixed by the Secretary of the Interior, * * *.
The entryman of lands to be irrigated by said system shall in addition to compliance with the homestead laws reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay the charges apportioned against such tract. * * *
A failure to make any two payments when due shall render the entry and water-right application subject to cancellation, with the forfeiture of all rights under this Act, as well as of any moneys paid thereon. * * * No right to the use of water for lands in private ownership shall be sold to any landowner unless he be an actual bona fide resident on such land or occupant thereof residing in the neighborhood of such land, and no such right shall permanently attach until all payments therefor are made.
All applicants for water rights under the systems constructed in pursuance of this Act shall be required to pay such annual charges for operation and maintenance as shall be fixed by the Secretary * * *, and the failure to pay such charges when due shall render the water-right application and the entry subject to cancellation, with the forfeiture of all rights under this Act as well as of any moneys already paid thereon.
The Secretary * * * is hereby authorized to fix the time for the beginning of such payments and to provide such rules and regulations in regard thereto as he may deem proper. * * *
The land irrigable under the systems herein provided, which has been allotted to Indians in severalty, shall be *619 deemed to have a right to so much water as may be required to irrigate such lands without cost to the Indians for construction of such irrigation systems. The purchaser of any Indian allotment, purchased prior to the expiration of the trust period thereon, shall be exempt from any and all charge for construction of the irrigation system incurred up to the time of such purchase. All lands allotted to Indians shall bear their pro rata share of the cost of the operation and maintenance of the system under which they lie.
When the payments required by this Act have been made for the major part of the unallotted lands irrigable under any system and subject to charges for construction thereof, the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary * * *.
Section 14 of the 1904 Act (finding 5) was amended by the Act of May 29, 1908, supra, to provide that the proceeds of the “sale of said lands” should be expended or paid as follows:
* * * So much thereof as the Secretary * * * may deem advisable in the construction of irrigation systems, for the irrigation of the irrigable lands embraced within the limits of said reservation; one half of the money remaining after the construction of said irrigation systems to be expended by the Secretary * * * as he may deem advisable for the benefit of said Indians in the purchase of live stock, farming implements, or the necessary articles to aid said Indians in farming and stock raising and in the education and civilization of said Indians, and the remaining half of said money to be paid to said Indians * * * semiannually * * * share and share alike: Provided, That the Secretary * * * may withhold from any Indian a sufficient amount of his pro rata share to pay any charge assessed against land held in trust for him for operation and maintenance of irrigation system [sic].
10. Section 22 of the 1904 Act, as added by the Act of March 3, 1909, 35 Stat. 781, 796, provided that:
* * *_ the Secretary * * * be, and he is hereby, authorized, in his discretion, to reserve from location, entry, sale, or other appropriation all lands within said Flat- *620 bead Indian Reservation chiefly valuable for power sites or reservoir sites, and he shall report to Congress such reservations.
In Section 25 of the 1904 Act, added by the Act of April 12, 1910, 36 Stat. 296, 291, Congress subsequently provided for lieu allotments for allottees displaced by any withdrawals made pursuant to Section 22.
11. Acting pursuant to the authority granted by the Act of March 3, 1909, supra (finding 10), the Secretary promptly withdrew from “location, entry, sale, or other appropriation” certain Reservation lands which included reservoir sites and the five hydroelectric sites alluded to in finding 3(b). The withdrawals were reported to Congress by letter dated April 21, 1909.[5] Flathead Site No. 1, known today as Kerr Dam, was developed under Federal Power Commission License No. 5, Montana; this claim arises from the provisions of that license.
12. By Presidential Proclamation dated May 22,1909 (36 Stat. 2494), the President opened to settlement and entry all the non-mineral, unreserved lands classified as agricultural lands of the first class, agricultural lands of the second class, and grazing lands within the Flathead Indian Reservation. The opening of the Reservation to settlement and entry took place May 2,1910.
13. On April 10,1910, in connection with the opening of the Reservation to settlement and entry, the General Land Office, Department of the Interior, published a “Schedule of Lands in the Flathead Indian Reservation * * *” subject to entry on May 2,1910. The Schedule included advice from the Superintendent, General Land Office, in part as follows:
The Government is now constructing irrigation works from which the farm units will be irrigated as far as possible, but it cannot at this time be told what part or how much of any particular unit can be furnished with water. It is probable that water can be furnished to only a small portion of some of these' units, and it is possible that there will be no water at all for some of *621 them, nor can it be told now when the water will be ready for any of these units, as the development of the irrigation projects has not yet proceeded far enough to enable the giving of definite information on this subject at this time. All applicants must bear this fact in mind and make their selections accordingly, as they will act on their own responsibility and without any guarantee from the Government, and the fact that water has not or cannot be furnished will not excuse any entryman from a full compliance with the requirements of the law as to residence, cultivation, and the payment of the Indian price. Some of the lands in this reservation have been allotted to the Indians, and the cost of constructing and maintaining the irrigation works will be apportioned among the farm units here scheduled and the Indian allotments in proportion to their irrigable areas, and each irrigable acre in both the units and the allotments will bear its proportionate part of the cost.
14. (a) In December 1909, defendant began work on a tumiel (the Newell Tunnel), located at or near Flathead Site No. 1, as part of a small hydroelectric project. The tunnel was to be about 11 feet by 11 feet and unlined, and about 1,800 feet long. The estimated cost of the proposed hydroelectric project of which it was a part was about $640,000, and it was contemplated that the project would furnish some 6,000 horsepower.[6] By 1914, in the bend of the river at Flathead Site No. 1, a tunnel “1,700 feet in length * * * through solid rock” had been constructed, “with the exception of a few feet at the upper end * * Defendant did not, then or ever, complete the Newell Tunnel, however, and, at least to about 1926, the project was sometimes described as abandoned. Compare findings 17(b), 18(b).
(b) The sums expended by defendant in connection with the Newell Tunnel (approximately $100,000) were from funds appropriated for the construction of “irrigation sys- *622 terns” and were originally “to be reimbursed from the proceeds of the sale of the lands within [the Flathead Indian] Reservation.” By the Act of May 18,1916, 39 Stat. 123,141, however, Congress provided that tribal funds theretofore covered into the Treasury in partial reimbursement of appropriations made for constructing the “irrigation systems” should be placed to the credit of the Tribes, and the moneys due the Tribes in consequence were ultimately restored to them.[7]
15. By the Act of May 18, 1916, supra, Congress appropriated an additional $750,000 for the construction of irrigation systems on the Flathead Indian Reservation; the said Act further provided that the “charge for construction of irrigation systems on the * * * Flathead * * * [Reservation] in Montana” should be “made against each acre of land irrigable by the systems” on the said Reservation “in the proportion of the total construction cost which each acre of such land' be’ars to the whole area of irrigable land thereunder”, and that the “rights of the United States heretofore acquired, to water for Indian lands * * * namely, the * * * Flathead Reservation land, shall be continued in full force and effect until the Indian title to such land is extinguished.”[8]
16. (a) By the Act of June 10, 1920, 41 Stat. 1063, commonly termed the Federal W'ater Power Act, Congress established a Federal Power Commission (then composed of the Secretary of War, the Secretary of the Interior, and the Secretary of Agriculture). Sections 10 (e) and (f), respecting licenses issued thereunder, provided in part as follows:
(e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the commission for the purpose of reimbursing the United States for the costs of the administration of this Act; for recompensing it for the use, occupancy, and enjoyment of its lands or other property; and for the expropriation to the Government of excessive profits until the respective States shall make provision for pre *623 venting excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the commission shall seek to avoid increasing the price to the consumers of power by such charges, and charges for the expropriation of excessive profits may be adjusted from time to time by the commission as conditions may require : Provided, That when licenses are issued involving the use of * * * tribal lands embraced within Indian reservations the commission shall fix a reasonable annual charge for the use thereof, and such charges may be readjusted at the end of twenty years after the beginning of operations and at periods of not less than ten years thereafter in a manner to be described in each license: * * *.
(f) That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the commission may deem equitable. The proportion of such charges to be paid by any licensee snail be determined by the commission. * * *
(b) Section 17 of the said Act provided in part that “all proceeds from any Indian reservation shall be placed to the credit of the Indians of such reservation.” In an opinion dated March 7, 1928, the Comptroller General advised the Chairman, Federal Power Commission, that Section 17 reserved “to the Indians all charges derived for the occupancy and use of tribal lands, or other tribal property, under licenses issued by your commission”, but that where a license “involves also, in addition to such tribal lands, other public property, the charges for the occupancy and use of such public property are not ‘proceeds from any Indian reservation’ within the meaning of the law requiring that such proceeds be placed to the credit of the Indians.”
17. (a) On January 6, 1921, the Rocky Mountain Power Company, a wholly-owned subsidiary of the Montana Power Company, filed with the Federal Power Commission an ap *624 plication for a preliminary permit to construct five power projects on tbe Flathead River below the outlet of Flathead Lake.
(b) In 1923, the Federal Power Commission reviewed protests to certain aspects of the Rocky Mountain Power Company’s proposed project at Flathead Site No. 1. Inter alia, the “Flathead Project Water Users’ Association” had protested “that the [preliminary] permit should not be granted unless the equities of [that] * * * Association * * * be recognized by requiring the licensee to furnish 10,000 horse-poiver to the residents of the Flathead project without cost.” The Commission saw no way “in which the request * * * could legally be complied with * * stated that “the equities of the * * * Association in Newell Tunnel are doubtful”, and added that “The only way in Avhich the Association could profit from the Newell Tunnel would be by completion of the power project as part of the irrigation project, and it is understood that to all intents and purposes the power project has been abandoned by the Government.”
(c) The Commission also considered “the relation of the Newell Tunnel to the proposed project from the Government standpoint”, commenting that “This tunnel was constructed about ten years ago for the purpose of developing power for pumping water as a part of the Flathead Irrigation Project as then proposed. It is understood that the part of the project involving the pumping of waters and the development of power has now been abandoned.” The Commission stated that the entire “investment of approximately $100,000 made * * * in the construction of the Newell Tunnel” had been met from appropriated funds, and that, accordingly, “It is not believed the Indians have any recoverable interest in the tun-xx&l. ^*5?
(d) On March 2, 1923, the Commission voted to suspend action on the Rocky Mountain Power Company’s application until receipt of a report of a pending investigation of the Columbia River watershed by the Department of the Interior.
18. (a) In August 1925 a committee headed by Congressman Louis Cramton of Michigan visited the Flathead Indian Reservation for the purpose of making “a study of the prob *625 lems with reference to * * *” the Flathead Irrigation Project.
(b) On April 20,1926, on the floor of the House of Kepre-sentatives, Congressman Cramton stated in substance (inter alia) that the government had spent nearly $6,000,000 in construction, operation, and maintenance of the irrigation systems, of which some $5,500,000 had not yet been repaid; that it would cost an estimated $2,000,000 additional to complete the irrigation systems; that for final completion and full development of the “project”, reservoir construction costing $700,000 or more would be required; that the Newell Tunnel had “never been utilized”; that the estimated cost to “construct and equip [a two-unit power plant developing 5,000 horsepower] in connection with that tunnel and construct transmission lines and substations connecting the power plant with all project towns and farming centers * * *” was $786,550; that construction of that plant had been approved by Congressman Cramton’s Congressional committee, and that construction of the plant:
(a) Provides for payment of $600,000 to $800,000 of charges on the Camas Division that were beyond the capacity of that division to pay, and gives a prospect of the Camas being able to pay as much more under a readjusted contract.
(b) By providing cheap power for pumping plants to furnish supplemental supply eventually needed for certain portions of the project, obviates the necessity of expending $700,000 to $800,000 for reservoirs as above stated.
(c) Furnishes needed cheap power to the farms and towns of the project that will aid much in attracting desirable settlers and making success possible.
(d) * * * clears the way for real development of tiiis project. * * * [and]
(e) * * * opens the way for return of $6,000,000 the Federal Government has invested there, with no charge-off, and for the building of a successful American community.
(c) By the Act of May 10, 1926, 44 Stat. 453, 465, Congress appropriated a total of $575,000 for the “continuing construction” of the proposed power plant (to be operated by defendant) at the Newell Tunnel location, and for construe *626 tion and maintenance of the irrigation systems. Congress further provided, however, that none of the money appropriated should be expended on construction costs until after the execution of an appropriate repayment contract “by a district or districts organized under state law embracing the lands irrigable under the project, except trust patent Indian lands * * [9] The Act required that the contract with the district or districts so formed provide for:
* * * repayment of all construction costs heretofore or hereafter incurred on behalf of such lands, * * * that the net revenues derived from the operation of the power plant herein appropriated for shall be used to reimburse the United States in the following order: First, to liquidate the cost of the power development; second, to liquidate payment of the deferred obligation on the Camas Division; third, to liquidate construction cost on an equal per acre basis on each acre of irrigable land within the entire project; and fourth, to liquidate operation and maintenance costs within the entire project. * * *
The Act also provided that all construction, operation and maintenance costs of the project were thereby made a first lien against all lands within the project, that any repayment contract executed pursuant to its requirements “shall recognize and acknowledge the existence of such lien”, and that a lien upon any particular farm unit should be released after payment of the total amount charged against such unit.
19. (a) By letter dated May 5,1926, the Rocky Mountain Power Company requested that the Federal Power Commission take action on its (then) suspended application for preliminary permit for development of power at Flathead Site No. 1. The Commission was told, in part, that:
If we are permitted to make the large development we will offer the Indian Bureau a block of power equal to *627 tb.e amount they plan to develop, at a price materially less than the cost to them of producing the same amount of power in the small development. * * *
(b)By letter dated May 6, 1926, the Rocky Mountain Power Company advised the Commissioner >of Indian Affairs in substance that if granted a satisfactory license to develop power at Flathead Site No. 1, the Company would (1) purchase the Newell Tunnel at its original cost of approximately $100,000; and (2) sell electric power to the United States “in the following amounts and at the following prices:

Kilowatts Yearly Charge

1850 _ $46,200.00
8700 —. 81,300.00
4800 _ 96,000.00”
Among other things, the said letter stated that the power offered equalled that which could conveniently be developed with a small development, and that the “yearly cost as given above is materially lower than the cost which would be incurred if the small development were made.” It also indicated a willingness to negotiate as to the proposal.
(c) The Rocky Mountain Power Company contemplated a 100,000 horsepower development; the Act of May 10, 1926, supra, contemplated a 5,000 horsepower one. The Rocky Mountain Power Company knew that the small development would preclude proper development of Flathead Site No. 1, and was admittedly “anxious to start and complete this development at the earliest possible moment * * *.”
(d) By letter dated July 8, 1926, the Rocky Mountain Power Company “amplified” its earlier advice to the Commissioner of Indian Affairs.
20. (a) On August 26, 1926, pursuant to an order of the District Court, Fourth Judicial District of Montana, the following irrigation districts, -including all of the irrigable lands of the Flathead Irrigation Proj ect (except Indian trust patent land) were formed:
1. Jocko Valley Irrigation District (to include the irrigable lands of the Jocko Valley Division of the Flathead Project);
*628 2. Mission Irrigation District (to include the irrigable lands of the Mission Valley Division lying south of Post Creek); and
3. Flathead Irrigation District (to include the lands of the Camas Division and that part of the Mission Valley Division lying north of Post Creek).
(b) In order to facilitate formation of irrigation districts at the earliest possible opportunity, so that the repayment contracts provided for in the Act of May 10, 1926, supra, might be negotiated, defendant deemed it “inadvisable” to inform water users on the Flathead Indian Reservation of the Rocky Mountain Power Company’s May 6, 1926, offer to supply power (finding 19 (b)). Defendant was then, however, of the opinion that the “general idea of a full development at the Newell power site appears to have considerable merit * * *” and warranted detailed study.
(c) Plaintiffs, and certain individual members of the Tribes, unsuccessfully opposed formation of the irrigation district» before the District Court, Fourth Judicial District of Montana, on the ground that this “would take away rights and property of the Indians.” A restraining order against the Flathead Irrigation District was subsequently obtained from the Federal District Court in behalf of some members of plaintiffs, but the restraining order was shortly thereafter removed and the matter was not further pursued.
(d) The commissioners of the three irrigation districts and government officials promptly began to negotiate the repayment contracts provided for by the Act of May 10, 1926, supra. Prior to execution by the commissioners, each negotiated contract was to be approved by “60% * * * and the same in acreage.” A repayment contract was executed by the Flathead Irrigation District on May 12, 1928. The Mission Irrigation District did not execute such a contract until 1931, and the Jocko Valley Irrigation District did not execute such a contract for some time thereafter.
21. (a) In September 1926', the Office of Indian Affairs detailed Edwin L. Rose, an employee of the IT.S. Irrigation Service, to the Flathead Indian Reservation with instructions to investigate and make a report on whether the Rocky *629 Mountain Power Company’s proposal “is such that we should endeavor to come to an agreement with the company or whether the Project should go ahead and build the small project provided for in the last appropriation act.”
(b) The Act of January 12,1927, 44 Stat. 934, containing appropriations for the Flathead Irrigation Project and “continuing construction of power plant”, conditioned expenditure of any sums for such construction upon the execution, by an irrigation “district or districts organized under state law embracing not less than eighty thousand acres of the lands irrigable under the project”, of an appropriate repayment contract.
(c) In a report dated January 28, 1927, Mr. Eose noted that the “purposes of developing power as a part of this project are threefold”: (1) to provide power for pumping water needed to augment the gravity supply for irrigation; (2) to furnish farms, towns, and other “developments and enterprises on the project relatively cheap electric power”; and (3) to utilize the “power resources of the project in a further way to insure the project’s success, viz: by the sale of electric energy, and from the profits thus derived, to pay at least a part of the cost of irrigating project lands.” He recognized both that Flathead Site No. 1 was a “very valuable one” and that the small power plant authorized by the Act of May 10,1926, supra, would “seriously retard the development of this valuable resource * * he favored “the development of the Newell power site in its full capacity or nearly so,” but inclined to the view that “this must ultimately be undertaken by private interests”; and he recognized that “Kegardless of who develops the power at the Newell site * * * and of the quantity developed, the tribal interests of the Flathead Indians in the power and power-sites must be recognized and compensated.” His suggested alternatives were that the government develop the site fully, selling most of the power to the Montana Power Company, or leasing the poAver plant to the Company “with a stipulation regarding use of power by the project”, or that the government “dispose of the power resources of the project, obtaining therefor a consideration in the form of a payment satisfactory to all *630 concerned * * * [and] negotiate a contract for the purchase of, or otherwise to obtain, power for use on the project and more specifically for pumping, * * *” at a sufficiently low cost to warrant its use for irrigation pmnping.
22. (a) In early February 1927, officials of the Montana Power Company, subordinates of the Commissioner of Indian Affairs, and a representative of the three irrigation districts engaged in a conference which continued over nearly a month’s time. The subject was the matter of leasing Flathead Site No. 1 to the Company; the result was the reaching of “tentative arrangements” which would, all parties realized, require Congressional action in order to become effective.
(b) On February 17, 1927, in a memorandum for the Commissioner of Indian Affairs, the Montana Power Company proposed (inter alia) that, if it or its subsidiary, the Rocky Mountain Power Company, were permitted to undertake development of “the Flathead River power sites on the Indian reservation”, “the Power Co.” would agree (1) to deliver all power required by the government for use of “the irrigation project exclusively for pumping water for irrigation, * * * up to 10,000 horse power, at a price of one mill ($.001) per kilowatt hour delivered”; (2) to deliver “such power as may be demanded by the United States for all project and farm uses and for sale up to 5,000 horse power at a price of two and one half mills ($.0025) per kilowatt hour delivered”; (3) to pay to the United States, during the life of the permits, “$1.00 per annual average horse power generated at its proposed Newell plant and all other plants on the Flathead River on said reservation erected below Flathead Lake, the idea being that the United States may devote the sum so paid as it shall see fit * * *”;[10] (4) upon the com *631 mencement of construction of “the Newell plant or any other plant”, to “reimburse the United States for the cost without interest, of the Newell tunnel which sum is about $101,000, * * ; (5) to develop the power site “to full capacity within a reasonable time * * and (6) to accept a contractual provision giving “the Government, the project or the irrigation districts, the exclusive right to sell power within the Flathead reservation.” The “right to make other arrangements if on July 1,1927 it is unable to make this contract” was reserved by the Company.
23. On February 26, 1927, Congressman Cramton introduced in the House H.R. 17291, 69th Cong., 2d Sess. (a proposed Deficiency Appropriation Act for 1927). Inter alia, the language of the bill authorized the expenditure of funds for either “continuation of construction of a power plant” in connection with the Flathead Irrigation Project or “the construction and operation of a power-distributing system * * * and for purchase of power, * * *” on stated conditions; the language of the bill also authorized the Federal Power Commission “to issue a permit or permits, or a license or licenses, for the use of power sites on the Flathead Reservation and water rights reserved or appropriated for the irrigation project for the development of power: Provided further, That the rentals from such permits or licenses * * * shall be divided between the Indians of said reservation as a tribe and the irrigation project, * * Another provision of the bill required, however, that “any rentals which may become available to the irrigation project through any permit or license * * * shall be used to reimburse the United States * * *” for construction, operation and maintenance charges. The bill died in the Senate Appropriations Committee. It is a fair inference that the language of the bill, as drafted, was intended to effectuate the Montana Power Company’s February 17, 1927, proposal (finding 22(b)).
24. (a) Some time prior to December 1927, Walter H. Wheeler submitted to plaintiffs an offer to lease (at least) Flathead Site No. 1, and in December 1927 plaintiffs entered into an agreement accepting Mr. Wheeler’s offer of $1.12½ *632 per developed horsepower. The said agreement was not a legally effective one.
(b) On January 11, 1928, Mr. Wheeler filed with the Federal Power Commission an application for a preliminary permit to develop the five hydroelectric sites on the Flathead River within plaintiffs’ Reservation. The application was accompanied by the December 1927 agreement between Mr. Wheeler and plaintiffs.
25. By the Act of March 7, 1928, 45 Stat. 200, 212-13, Congress (1) provided (inter alia) that the unexpended balance of the $395,000 appropriated in 1926 for “continuing construction of power plant” might be used “for the construction and operation of a power distributing system and for purchase of power for [the Flathead Irrigation] project * * following execution of an appropriate repayment contract as provided for in the 1926 Act, (2) authorized the Federal Power Commission “in accordance with the Federal Water Power Act and upon terms satisfactory to the Secretary of the Interior, to issue a permit * * * or a license * * * for the use, for the development of power, of power sites on the Flathead Reservation and of water rights reserved or appropriated for the irrigation projects * * and (3) provided that “rentals from such licenses for use of Indian lands shall be paid the Indians of said reservation as a tribe, which money shall be deposited in the Treasury of the United States to the credit of said Indians, and shall draw interest at the rate of 4 per centum * * *.”[11]
26. (a) On March 21, 1928, the Flathead Irrigation District addressed a letter to Congressman Cramton. The said letter (1) indicated that Flathead Irrigation District representatives contemplated that the Secretary of the Interior and the Federal Power Commission “would exact” from any licensee of the Flathead power sites the “benefits for [the Flathead Irrigation] project in the shape of power which it has been proposed heretofore that the project should receive”; (2) alluded to an oral agreement by the Montana *633 Power Company to furnish the Flathead Irrigation Project an additional 5,000 (of 15,000) horsepower “for any purpose” (Montana Power Company’s earlier proposal (finding 22 (b)) was that this 5,000 horsepower be used only for pumping and irrigation purposes); (3) stated that the Flathead Irrigation District was “counting” upon a condition “that the licensee should be required to furnish the project the amount of power which the Montana Power Company has indicated it is willing to furnish and at the prices stated above”; and (4) requested that Congressman Cramton look into the matter and, if necessary, “advocate on our behalf the making of such orders and requirements as will insure our securing the power benefits proposed.”
(b) By letter dated April 4, 1928, Congressman Cramton advised the Flathead Irrigation District that he had again taken up “protection of the interests of the irrigation project in connection with the issuance of permit for the Flathead water power development * * and that he had received the assurances of the Indian Bureau “that your interests will be fully safeguarded.”
(c) On December 19, 1928, the Flathead Irrigation District adopted a “resolution” that the rights and interests of the Flathead Irrigation Project “would he adequately safeguarded” by a requirement in any lease or permit for the development of Flathead Site No. 1 and other tribal power sites that the lessee comply with Montana Power Company’s February 17, 1927, memorandum (finding 22(b)) as orally modified by the Montana Power Company thereafter (finding 26 (a)). The Montana Power Company and its subsidiary, the Rocky Mountain Power Company, accepted, approved, and agreed to the “resolution” December 20,1928.
27. The Tenth A nnual Report of the Federal Power Commission, Fiscal Year Ending June 30, 1930, reflects, inter alia, that:
(a) On March 27, 1928, shortly after enactment' of the Act of March 7, 1928, supra, the Rocky Mountain Power Company made application for license for “a proposed project at what is commonly known as site No. 1 * * the proposed project was to “consist of a dam with crest gates *634 to afford an average effective 'head of 'about 182 feet and to afford 10 feet of regulated depth of storage on Flathead Lake, * * * a power 'house with an installed capacity of 150,000 horsepower, and appurtenant works.”
(b) In April 1928, the Chief of Engineers, War Department, recommended that Rocky Mountain Power Company’s 1921 application (finding 17(a)) be granted, and that Mr. Wheeler’s January 1928 application (finding 24(b)) be denied.
28. (a) In the Act of March 4, 1929, 45 Stat. 1562, 1574, Congress provided (1) that the unexpended balance “for continuing construction of the irrigation systems on the Flathead Indian Reservation * * *” appropriated by the Act of May 10, 1926, supra, as continued available in the Acts of January 12, 1927, supra, and the Act of March 7, 1928, supra, should “remain available” for fiscal year 1930, subject to the reimbursable and other provisions of the said Acts, and (2) that “not more than $10,000 of the unexpended balance * * * made available * * * for the construction of a power distributing system and for purchase of power, or for construction of power plant, shall be available for operation and maintenance, and $40,000 shall be available for construction of laterals near Ronan.”
(b) In the Act of March 4, 1929, 45 Stat. 1623, 1640, Congress provided:
* * * That the Federal Power Commission in issuing any permits or licenses for the development of power or power sites on the Flathead Indian Reservation * * * as authorized by the Act of March 7, 1928 * * * is hereby authorized and directed to waive payment of the usual administrative fees or commissions charged under existing laws relating to or under regulations of said Federal Power Commission in the issuance of any such permits or licenses.
The said Act also permitted the expenditure of not more than $220,000 of the above “unexpended balance” (finding 28 (a)) for specified construction and maintenance work on the irrigation systems, with any portion remaining to be available “if and when license for the development of power on the Flathead River shall have been issued by the Federal *635 Power Commission as provided in the Aot of March 7, 1928 * *
29. (a) The Tenth Annual Report of the Federal Power Commission (finding 27) reflects that on July 16, 1929, the Chief of Engineers, War Department, recommended that “a license be granted to the Rocky Mountain Power Co., with appropriate safeguards to navigation and irrigation in the basin of Flathead Lake.”
(b) By letter dated August 22,1929', the Executive Secretary of the Federal Power Commission advised Mr. Wheeler that denial of his application for a preliminary permit to develop hydroelectric sites on the Flathead Indian Reservation, and issuance to the Rocky Mountain Power Company of a preliminary permit “subject to appropriate conditions,” would be recommended to the Federal Power Commission; Mr. Wheeler was further advised that he might, within 30 days thereafter, except to the conclusions stated in the said letter[12] or file application for “further hearings in this office.”
(c) Mr. Wheeler protested the proposed action Of the Commission (albeit indirectly), and in consequence a public hearing on the two applications was scheduled and subsequently held. See finding 31.
30. (a) By letter dated September 6, 1929, J. Henry Scat-tergood, Assistant Commissioner of Indian Affairs, requested of the Executive Secretary of the Federal Power Commission “the view of your legal advisors as to the legal status, as apart from any equitable status, of the irrigation districts on the question of the much discussed 15,000 H. P. of cheap power for pumping and for general purposes.” [Emphasis in original.]
(b) By memorandum dated September 20,1929 (29 pages in length, with 28 appendices), a Senior Attorney of the Federal Power Commission advised the Executive Secretary of the Commission that, in his view:
The only conclusion to be reached from the foregoing discussion is that when license issues, if at all, it should *636 issue under the general conditions of the Federal Water Power Act, without any consideration of the claims of the irrigation districts or of the settlers, and that their claims, if any they have, are matters to be settled by Congress out of the funds of the United States in accordance with its own views of justice and equity. * * *
The attorney also advised that “if the proposed contract should be made, the proposed line constructed, and the proposed diversion of revenues away from the Indians be accomplished, the Indians would have a claim against the United States on account of the taking away of a valuable part of their lands.”
31. (a) The hearing referred to in finding 29 (c) was held during the period October 28-November 9,1929. Present were Mr. Wheeler, the Rocky Mountain Power Company (whose representatives included F. M. Kerr, vice president and general manager and H. H. Cochrane, chief engineer of the Montana Power Company), the “Flathead Indians,” the “Flathead Irrigation District”, the executive secretary of the Commission, Mr. Scattergood (still Assistant Commissioner of Indian Affairs and also representing the Secretary of the Interior) and others (some representing governmental, and some private, interests). The hearing consumed 11 days’ time and resulted in a record nearly 2,300 pages long.
(b) At the hearings, devoted primarily to the resolution of competing applications for the issuance of a Federal Power Commission license, both applicants submitted evidence that “the concession of this 15,000 horsepower” to the irrigation project at the prices agreed to by the Montana Power Company and the Rocky Mountain Power Company (see findings 22(b), 26) would result in a loss to the supplier. Mr. Wheeler expressed the conclusion that “it would cost the power company $11,200 a year to furnish [10,000 horsepower] at 1 mill”,[13] while the Eocky Mountain Power Company submitted an exhibit showing the “Estimated Loss in Furnishing Power on Eeclamation Project” to be $62,500 a year.
*637 (c) The question whether the “giving of the 15,000 horsepower to the irrigation project” would reduce rentals payable to the plaintiffs received at least some attention at the hearings. The closest thing to a direct answer to that question cited by either party in their respective requested findings of fact is a statement by Mr. Kerr that this was “a very debatable question”, that furnishing the power would cost money, and “that it might be argued that therefore it decreases the Indian income.”
32 (a) On December 30,1929, Mr. Scattergood submitted to the Secretary of the Interior and the Federal Power Commission a memorandum on the “Flathead Power Development.” [14] He noted at the outset that, with respect to power development on the Keservation, Congress had “made two unique provisions in addition to the general application of the Federal water power act” (that any license should be on terms satisfactory to the Secretary, and that the usual fees charged by the Federal Power Commission for administration and for use of lands had been waived in favor of the Indians) .[15]
(b) The 1929 Scattergood memorandum stated that, under Federal Power Commission regulations,
* * * to fix the proper rental basis for the use of Indian lands, it is necessary to determine the value of the power sites from their earning standpoint for power purposes. This involves a careful study of (1) the two applicants’ proposals; (2) the actual earning power of the Montana Power Co. system, guarantor of one of the applicants; and (3) suggested modifications of the two applicants’ proposals.
sH ❖ ❖
The Indian Bureau is limiting this memorandum regarding the two applications to an analysis of their power features and to necessary regulatory provisions for proper control in their relation to the question of rentals for the Indian power sites. No attempt is here made to *638 consider the feasibility of the plans of either applicant for marketing the power or their respective ability to finance their proposals * * *
(c) The 1929 Scattergood memorandum also stated that:
In an ordinary power site lease under the Federal water power act there would be only two parties having an interest in the financial results of operating, viz, the successful licensee and the general consuming public. * * *
In the case of a power development upon Indian lands, th¿ title to the site * * *remains vested in the United States Government but in trust for the Indian tribe, and the site is rented for the 50-year period of the lease to the licensee. * * * Thus in an ordinary Indian case there are three interests to be adjusted, viz, the successful licensee, the United States for the Indian tribe, and the general consuming public.
In the particular case of the Flathead there is a fourth interest, viz., a special part of the consuming public consisting of (1) individual Indian land holders and (2) white settlers who have bought Indian lands, which two groups together comprise the Flathead irrigation project * * * referred to in the legislation already referred to. Thus in the case of Flathead, the Federal Power Commission and the Secretary of the Interior are called upon to make an adjustment between four interests, viz, (a) the successful licensee, which is, of course, entitled to the usual return of 8 per cent under the practice of the Montana Public Service Commission; (b) the Indian tribe, which is entitled to a fair rental for the use of the power sites; (c) the particular part of the public forming the irrigation project, and to which certain low rates for power up to 15,000 horsepower have been promised by one applicant as further explained below; (d) the general consuming public.
33. The 1929 Scattergood memorandum suggested, in fixing the “original rental for the first 20-year period”, the determination of “the estimated * * * average annual generating cost, including return but excluding rental per horsepower year”, and the fixing (by the Federal Power Commission) of a “fair wholesale bus bar price for the current generated at * * *” Flathead Site No. 1; it stated that the *639 difference between the two figures “represents the economic rental value of the site, and should be divided between the Indians and the general public in proportion to their respective interests.” After reciting consideration of, inter alia, “factors affecting power capacity”, “development costs”, “annual generating costs”, “intercompany price”,[16] and “the benefit which will automatically accrue to the [downstream] Thompson Falls plant of the Montana Power Co. * * * caused by the regulation of flow through the increased storage at Flathead”,[17] the said memorandum continues as follows:
VI. INDIAN RENTAL
We are now in position to 'assemble the elements already considered and to develop what they reveal to be available for (1) the company’s return, (2) Indian rental, (3) general consumers, and (4) the special consumers in the irrigation projects. In order that full justice be done to the Indians, it is proposed here to consider the case first as if there were only the first three parties and no irrigation project, and thus to fix the proper intercompany price for the pro forma calculation of the Indian rental; then secondly to make such slight modification in said intercompany price * * * as may be necessary to provide under existing conditions the reservation by the United States for the irrigation project of 15,000 horsepower at the prices agreed upon in advance by one of the applicants.
34. (a) The 1929 Scattergood memorandum noted that “so far as Indian rental goes, Wheeler’s proposition of selling power at $15 per horsepower can not compare with applicant Rocky Mountain Power Co.’s intercompany price of $18 in advantage to the Indians.”
*640 (b) In the said memorandum, Mr. Scattergood “adjusted” the Rocky Mountain Power Company’s estimates in certain respects, thus computing the “adjusted estimated average generating cost for 80,500 horsepower including 8 per cent return at Flathead * * *” to be $13.39 per horsepower. The memorandum noted, imter alia, that this was $4.49 per horsepower less than the Rocky Mountain Power Company’s “own estimate * * * at 8 per cent return and including Indian rental and irrigation cost, at 68,000 horsepower”, and $4.33 per horsepower “less than Montana Power Co.’s system generating cost of 1926 at 8 per cent return.”
(c) Immediately thereafter, the memorandum stated that:
As already pointed out, the difference between the intercompany wholesale price and the annual average generating cost represents the economic rental value of the site and this should be divided between the Indians as a tribe and the general public interests (of which of course the Indians as individuals also form a part) in fair proportion. In other words, the Indians have the ownership of the five sites and of that portion of the Flathead Lake that lies within the reservation, while the State of Montana owns the remainder of Flathead Lake and the right to control the use of the waters in the lake and river over and above the prior rights of the Indians. Thus both the Indians and the general public have rightful interest in the Flathead power development. Hence it would seem fair that whatever economic rental value this site has should be divided either approximately half to the Indians as a tribe and half to the public, or if it is really 'possible to determine their respective interests more exactly, that this rental value should be apportioned pro rata between them. * * * it seems best for the purposes of this memorandum to assume 50% of the economic rental value of the site as belonging to the Flathead Indians as a tribe, and the other 50% as belonging to the general public of the State of Montana. * * * the Indian rental will be paid to the Federal Government in trust for the Indians, and the public’s interest will be under the care and protection of the Montana Public Service Commission in its regulation of the Rocky Mountain Power Co. and the Montana Power Co.
*641 (d) “Applying the above, * * *” the 1929 Scattergood memorandum reached a figure of “$2.21 per horsepower as a fair rental for the Indians.”[18]
(e) The 1929 Scattergood memorandum also considered another “phase of Indian rental besides its rate * * *”; noting that both applicants estimated a construction period of 3 years, and that during the construction period “no income would be obtainable”, it suggested for the said period “an arbitrary fair minimum [rental] * * * of $20,000 per annum.” It further suggested a provision for progressive minimum rentals designed to protect plaintiffs against, in substance, manipulation of utilization of the site by either applicant during the first few operating years.
35. (a) Section YII of the 1929 Scattergood memorandum then treated “The Flathead Indian Irrigation Project, and 15,000 Horsepower for Pumping and Other Uses.” The memorandum stated that the Indian Bureau “has the double responsibility of protecting fully the tribal rights of the Indians in the matter of power rentals and also of doing everything possible to make a success of the Flathead Indian irrigation project committed to its care”, but that “these interests are [not] really conflicting * *
(b) The memorandum further stated that the Indian rental had been considered “just as if there were no irrigation district at all; * * * $2.21 per horsepower * * * involves, if the license is granted to the Kocky Mountain Power Co., an intercompany price of 2.387 mills for the current sold * * * to the Montana Power Co.”; and that:
This Indian rate of rental having thus been fixed, we can properly turn to the irrigation project and consider it as one special group of general consumers that the United States Government is particularly interested in protecting to the extent of 15,000 horsepower for pumping and _ for the project and for sale. The justification for this is that the irrigation project is the Government’s *642 own project, and the Government’s hope of 'reimbursement depends upon the project’s success. The provision for sale of current in the above quotations[10] was based on the expectation that a profit can be realized on the retail sale of electric current purchased at low wholesale prices, and that this profit will enable the Flathead irrigation district to be an assured success and thus reimburse the project’s construction costs to the Government more rapidly than would otherwise be possible. * * *
(c) The said memorandum noted that “10,000 horsepower at 1 mill is lower than the * * * proposed intercompany price of 2.387 mills; but that for 5,000 horsepower at 2% mills is actually a trifle higher.” It concluded that the “problem then is to see how much the intercompany price * * * needs to be raised in order to offset these relatively small amounts of current at these prices to be reserved by the applicant for the United States for the use of the irrigation project.”
(d) The said memorandum further noted the Eocky Mountain Power Company’s estimate, at the 1929 Federal Power Commission hearings, that supplying the “current” at “these prices” would result in an excess of cost over revenue of $62,500, but, by a process of recalculation, reached the conclusion that the out-of-pocket loss therefrom would in fact be “only $25,336”, and that by raising the intercompany price the price to the Montana Power Company) from 2.387 milis per kilowatt ¡hour to 2.439 mills per kilowatt hour, the Eocky Mountain Power Company could sell the 15,000 horsepower to the irrigation project at the prices quoted and “still have its full average revenue of 2.387 mills * * * which will enable it to pay the undiminished Indian rental of $2.21 and preserve its own 8 per cent return.”
(e) The said memorandum reflects this “Conclusion In Ee 15,000 Horsepower for Irrigation Project”:
The Indian Bureau believes that the matter of this 15,000 horsepower for the irrigation project has had far more adverse discussion than it deserves; that it would be most fortunate for the best interests of the Indians *643 and of their neighbors if all would realize that they have common interests in making the irrigation project a success for the good of all; that accordingly the obtaining of this cheap power for the project’s use in pumping and for farms, etc., is highly desirable; and in fact that it is unthinkable that the opportunity to get it shall not be availed of. This does not mean, as some friends of the Indians may have feared, that the Indian Bureau does not recognize fully the rights of the Flathead Indian Tribe as the equitable owner of the power sites concerned. These rights are fully recognized and preserved and no precedent to the contrary can be set up from the disposition of this case. And further, while thus recognizing the tribal interest, the Indian Bureau also recognizes the rights and equities of individual members of the tribe as residents in and owners of land in the community chiefly to be benefited by the erection of the power project or projects including the Flathead irrigation project, dependent in part, as it is, on power at a reduced rate to supply water tor irrigation and other purposes.
Accordingly, we urge the Secretary of the Interior and the Federal Power Commission in granting a license for site No. 1 to either of the applicants, to insert in said license conditions for the reserving to the United States Government for the use and benefit of the Flathead irrigation project of 15,000 horsepower of electric power substantially as set forth in paragraphs A, B, D, E, K, L, and N of the Rocky Mountain Power Co.’s memorandum of February 17,1927, as amended December 30,1928, by agreement with the Flathead irrigation district, and on the terms and conditions therein stated. * * *
(f) The 1929 Scattergood memorandum contained this “Conclusion”:
* * * it seems possible at last to solve this complex problem * * * to the satisfaction of all of the interests involved. * * * the advantages and resulting low costs of this power site will make it possible (1) to give the developing licensee a full return upon the investment; (2) to considerably increase the Indian rental beyond the offers made[20] or even the expectations of the Indians; *644 (3) to provide for the full amortization of the power development cost during the 50-year period of the lease and at the close of the lease its return to the Government for the Indians as a going concern fully paid for, then to be released or otherwise disposed, of as may then seem best; (4) to accommodate the irrigation project by the granting in full of its request for cheap power; (5) should the license be granted to the Rocky Mountain Power Co., to make available from the Flathead development itself and from the beneficial effects therefrom upon the Thompson Falls plant of the Montana Power Co., certain further amounts which under the regulation of the Montana Public Service Commission will be available for rate reductions for the benefit of the general consumers of the latter company; (6) should the license be granted to Mr. Wheeler, to make available from the Flathead development advantages to the Indians and other people of that section from the introduction of new industries, with resulting opportunities for new employment, new markets, etc.; (7) to establish a method of calculation of Indian rentals for power sites; (8) to provide for proper regulation [federal and state] * * * of the licensee * * *.
36. (a) On May 14, 1930, Mr. Scattergood submitted to the Secretary of the Interior a supplemental memorandum “in re Flathead power development * * *.” This memorandum was approved by the Commissioner of Indian Affairs prior to its submission.
■(b) The 1930 Scattergood memorandum noted that “the Federal Power Commission on the showings made by the applicants have recommended that the Rocky Mountain Power Co. be awarded the license for site No. 1 as applied for, provided satisfactory terms of Indian rental could be agreed upon, and that applications from both applicants for preliminary permits upon the other four sites be rejected.” It also referred to a showing, in the 1929 Scattergood memorandum, of “the inadequacy of the offers of Indian rental made by either of the two applicants”, and indicated that this view had been “amply supported by the separate studies made by the Federal Power Commission and by the Army Engineers * * the latter at the Secretary of Interior’s request.
*645 (c)The 1930 Scattergood memorandum stated that there were three methods by which Indian rentals could be calculated : (1) at a fixed rate per horsepower produced;[21] (2) at a combination of “a fixed rental plus ‘an energy charge’'; and (3) at a flat rental basis.
(d)In the 1930 Scattergood memorandum, the “combination of fixed [rental] charge and energy charge” method was described as, in effect, “one of adopting a minimum fixed rental charge up to a given horsepower development, plus an energy charge for development above that point and at such a rate as will divide the excess between the Indians and the public (through the company under regulation).” The memorandum further stated that this method was “in effect a profit-sharing arrangement * * having the advantage for plaintiffs of considerably greater rentals in the higher brackets of po wer production; “in the lower brackets”, however, there would be disadvantage to them. This method was used by the Federal Power Commission, Army engineers, and the Indian Bureau, for estimates “based on studies of the [several stated] variables * * Assuming a 75 percent load factor, and an output of 50,000,000 kilowatt hours per month, the Federal Power Commission’s estimate of “Total rental”, after 5 years of operation, was approximately $289,000 per year. Using a “Capacity developed” of 90,000 horsepower, or 591,300,000 kilowatt hours, Army engineers’ rental recommendation was in the range of $231,000 to $241,000 per year. The Indian Bureau’s estimate, using essentially similar assumptions, was approximately $285,000 per year.
(e)The 1930 Scattergood memorandum reflects that:
* * * Four months of negotiations were consumed in discussing those various plans and the variables upon which they were based and we were never able to reach an agreement. Several deadlocks actually developed with the breaking off of negotiations. Finally efforts on *646 these lines were abandoned and a new approach was entered upon with the plan of a flat rental.
(f) The 1930 Scattergood memorandum reflects that the “third plan of a flat rental basis * * *” was ultimately agreed to,[22] because it had these advantages:
* * * (1) reducing all risks to the Indians and providing an assured, definite and uniform rental regardless of the amount of use of the plant by the licensee; (2) it avoids the difficulties of assuring to the Flathead plant its fair proportion of system load; (3) it avoids any inducement that Flathead be used for peaking purposes, or that it be starved unduly at high water periods when other plants of the system could carry an increased share of the load; (4) it avoids all problems arising from any form of partnership of the Indians with the licensee; and (5) it eliminates subjecting the Indians to the ups and downs of business and to industrial depressions, a feature which especially exists in Montana, where the electric demand is so largely industrial in character. In the case of applicant Wheeler, whose plan provided for an exclusively industrial load, this, business variation of load would have had its maximum effect upon Indian rentals.
(g) The 1930 Scattergood memorandum contained the following excerpt:
IRRIGATION DISTRICTS
* * * in 1927, and again in 1928, the applicant had voluntarily agreed to sell to the United States for the irrigation district up to 15,000 horsepower at prices of 1 mill for 10,000 horsepower and 2y2 mills for 5,000 horsepower. In Indian Bureau’s memorandum of December 30, 1929, it was shown that the latter price of 2% mills is greater than the estimated cost at Flathead site No. 1, including return and Indian rental. Hence, on the 5,000 horsepower block there will be no loss. On the block of 5,000 horsepower at 1 mill for pumping and 5,000 horsepower at 1 mill for general uses and for sale, there will probably be very small loss, if any, because much of this use will be at the time of secondary power. However, even if the load factors are as the applicant has estimated and a part is primary power, we have shown in our memorandum of December 30, 3 929, that *647 after the calculation of the Indian rental, by a slight increase in the intercompany price, the small cost of this power will be provided for without in any way affecting the Indian rental.
* * * in all our negotiations regarding the Indian rentals this matter of the irrigation power was completely ignored. It was recognized by the company’s representatives, as well as by those representing the Government, that at Thompson Falls there will be developed, because of Flathead storage, more than twice as many additional kilowatt-hours than oan possibly be used in the entire irrigation 15,000 horsepower demand. Hence, this delivery of this power can and will be provided without the slightest effect in reducing the Indian rental.
Accordingly there have been included in the license the features desired by the irrigation project and already agreed to, as stated, viz:
(1) The agreement to supply the 15,000 horsepower at the prices previously stated.
(2) To refund the $101,000 to the Government for the cost of Newell Tunnel, which will be completed and used 'by applicant for river diversion during construction.
(3) The supplying to the project up to 500 horsepower at line voltage during the construction period.
(4) The right to use Flathead Lake and River water above the dam for irrigation purposes, provided not more than 50,000 acre-feet shall be used after July 15 in any year.
(h) The 1930 Scattergood memorandum concluded by recommending “the issuance of the license for site No. 1 for immediate development as now agreed upon to Rocky Mountain Power Co.”
37. On May 19,1930, the Federal Power Commission authorized the issuance of a license to develop Flathead Site No. 1 to the Rocky Mountain Power Company, upon terms and conditions to be described hereinafter, and voted to reject (1) the application of Mr. Wheeler “for preliminary permit for the five sites * * * without prejudice, however, to submission by him of an application for preliminary permit or license for the lower four sites * * and (2) the application of Rocky Mountain Power Company “for preliminary permit for the lower four sites * *
*648 38. (a) On May 23,1930, the Federal Power Commission issued to the Bocky Mountain Power Company License No. 5, Montana, for tbe development of Flathead Site No. 1. The terms and conditions thereof were approved by the Secretary of the Interior, and accepted by both the Montana Power Company and the Bocky Mountain Power Company, that same day. The license was issued for a period of 50 years from May 23,1930.
(b) The license, which included a description of the project, fixed payments to plaintiffs on the basis of the “flat rental” method. Article 30 of the license called for the licensee to pay, up to and “including the month in which the project is placed in commercial operation”, $1,000 per month, and thereafter, “extending to the end of the calendar year in which such commercial operation shall commence”, $5,000 per month. Thereafter, payments were to be made as follows:

Payment

Period per year

First two years_ $60,000
Third year_ 75,000
Fourth year_ 100,000
Fifth year_ 125,000
Next five years_ 150,000
Next five years_ 160, 000
Next five years “and/or until readjustment of the annual charges payable hereunder shall have been effected pursuant to the provisions of paragraph (D) of this Article 30”_ [23]175,000
(c) License No. 5, Montana, further provided, inter alia, that:
(1) Construction should begin within 1 year from May 23, 1930, and that the licensee should within 3 years “thereafter complete the installation of three units of not less than 150,-000 horsepower aggregate capacity” ;
(2) in “consideration of the use to be made of the partially completed Newell tunnel, the licensee shall pay into the treasury of the United States * * *”$101,685.11;
*649 (3) during the construction period, the licensee would deliver to the United States up to a maximum demand of 500 horsepower, at a price of 2% mills per kilowatt hour, “for farm and project purposes on the Flathead irrigation proj-6ct *
(4) coincident with the beginning of commercial operation of the project works, the licensee would make available, and defendant, “for and on behalf of the Flathead irrigation project or the Flathead irrigation district, may take and, having taken, shall pay for, [1] at the price of one mill per kilowatt hour * * * electrical energy in an amount not exceeding 5,000 horsepower of demand to be used exclusively for pumping water for irrigation; and * * * electrical energy in an amount not exceeding 5,000 horsepower of demand for all project and farm uses and for resale * * and (2) “at the price of two and one-half mills per kilowatt hour, additional electrical energy in an amount not exceeding 5,000 horsepower of demand for all project and farm uses and for resale”;
(5) defendant reserved “to itself or to the Flathead irrigation project management the exclusive right to sell power within the boundaries of the Flathead Indian Beservation, to the extent of 10,000 horsepower to be delivered for use and/or sale as provided * * *” above;
(6) the licensee would pay to defendant “reasonable annual charges * * * for the use, occupancy and enjoyment of public and reserved lands (not including Indian tribal lands) * * and that, for purposes of determining such charges, “the prime power capacity of the project shall be taken as 80,000 horsepower”; and
(7) the licensee would enter into a contract with the Montana Power Company under which all electrical power or energy generated by the project, except that “delivered to or reserved for the United States pursuant to * * * this license * * *” should be delivered to or made available to the Montana Power Company at an “annual amount approximately sufficient to meet operating expenses and maintenance costs, taxes, accruals for depreciation and rentals (including the rental charges provided for by this license) and in addi *650 tion an average return of eight per cent per annum on its actual legitimate investment in all facilities and property covered by this license and used in the generation and delivery of such power * * *.”
39. (a) The licensee was unable to complete construction of the project works within the time for completion originally set forth in License No. 5, Montana, and by 1932 amendment to the said license the time for completion was extended to May 23,1935.
(b)' By Amendment No. 2, dated July 17, 1936, the licensee’s time for completing the installation of a unit of not less than 77,000 horsepower was extended to May 23, 1939; the said Amendment also provided that a second unit of like capacity would be installed. Amendment No. 2 also amended Article 26 (finding 38(c) (4)) by substituting for “Coincident with the beginning of commercial operation of the project works” the words “On June 1, 1939 or on such earlier date as the project works may be placed in commercial operation.” Amendment No. 2 also added to Article 26 a provision that, during the period June 1, 1934 to June 1, 1939, the licensee would make available to defendant, at a price of one mill per kilowatt hour, “5,000 horsepower for the use of the Flathead irrigation project or the Flathead irrigation district * * *.”
(c) Amendment No. 2, approved by plaintiffs, the Secretary of the Interior, and the Federal Power Commission, alluded to an agreement between plaintiffs, the licensee, and the Montana Power Company whereby, inter alia, plaintiffs would receive liquidated damages for failure to complete the first unit of 77,000 horsepower capacity upon the terms and conditions set forth in the said agreement. Amendment No. 2 also modified the original scheme of annual rental payments, and added a new Article (Article 43) waiving any defaults in the performance of the terms and conditions of the license prior to the date of the amendment. Article 43 further provided that:
If for any cause beyond the control of the Licensee, the power to be developed at the project is not produced or cannot be marketed, then and in such event, if the
*651 Licensee has paid or shall pay to [plaintiffs] a sum in liquidated damages, which together with all other amounts of 'liquidated damages paid to said tribe under the above-mentioned agreement * * * will aggregate the sum of $1,000,000, then Licensee at its option, after performing all acts required to be performed and making all payments required to be made by it to the date of surrender, under the license as amended, shall be entitled to surrender this license as amended and terminate all obligations thereunder and upon any such surrender all property of the Licensee located within the project boundary shall forthwith become the property of the United States, in trust for the aforesaid tribe; * * *
40. (a) At the 192!9 hearings before the Federal Power Commission (finding 31) the Eocky Mountain Power Company had submitted an exhibit showing the annual “Estimated Loss in Furnishing Power on Keclamation Project”, on terms substantially identical to those subsequently contained in License No. 5, Montana, to be $62,500. The said exhibit utilized the demand-energy approach to costing. Mr. Wheeler had then testified (albeit in rather conclusory fashion) that there would be a “cost” (in his opinion, $11,200 per year) associated with furnishing 10,000 horsepower per year to defendant at 1 mill per kilowatt hour. Through a process of adjustment to the Eocky Mountain Power Company’s “loss” estimate, the 1929 Scattergood memorandum reflected that the Company’s out-of-pocket loss would be “only $25,836”, rather than $62,500.[24] The 1929 Scattergood memorandum, which employed a straight energy, or straight kilowatt-hour average cost, approach, did not express itself directly to Mr. Wheeler’s estimate of “cost.”
(b) In Confederated Salish and Kootenai Tribes v. United States, 189 Ct. Cl. 319, 417 F.2d 1340 (1969), the court alluded to the Eocky Mountain Power Company’s and the 1929 Scat-tergood memorandum’s calculations. The court stated that “the power company probably incurred an annual loss in supplying tlie 15,000 horsepower to the Federal Government”, and that “From that significant fact it would appear, at least *652 prima facie, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed.” The court then called “for further exploration to see whether, in fact, the loss on the sale of this block of 15,000 horsepower would have any effect on the rentals payable to the Tribes”. The court stressed that “The issue of the existence of a loss, as well as of the amount, remains to be tried again”, and held that, “To recover, plaintiffs must prove that a supposititious willing buyer desiring to develop the site for power purposes, and able to obtain the necessary license, would have paid, and a willing owner would have accepted, a higher rental than the amount actually paid, if the former had not been burdened with the necessity to sell at the prescribed rate the block of 15,000 horsepower to the Federal Government, and then the plaintiffs must show the probable amount of that excess.”
41. (a) At trial held in July 1970, Mr. Melwood W. Van Scoyoc, whose qualifications as an expert in the field of electric power rates were conceded by defendant, appeared as a witness for plaintiffs.
(b) Plaintiffs’ expert made four separate calculations[25] of the “Value as of May 23, 1930,” of the “Excess of Cost to Montana Power Company of Furnishing Electric Power to Flathead Irrigation Project * * *” pursuant to License No. 5, Montana.[26]
(1) “Based on Determination of * * * Loss of $62,500 * * *”, and utilizing a 4 per cent interest discount factor, Ms calculation of 1930 “Value” was $1,007,664.
(2) “Based on Determination of * * * Loss of $25,336 * * *”, and utilizing a 4 per cent interest discount factor, his calculation of 1930 “Value” was $427,231.
(3) “Based on Determination of * * * Loss of $62,500 * * and utilizing a 6 per cent interest discount factor, his calculation of 1930 “Value” was $675,995.
*653 (4) “Based on Determination of * * * Loss of $25,336 * * and utilizing a 6 per cent interest discount factor, Ms calculation of 1930 “Value” was $290,621.[27]
(c) The calculations set forth in finding 41 (b) were “based on loss to the power company”, and their validity is entirely dependent upon the accuracy of the two 1929 estimates. To the extent of any inaccuracies in those estimates, the calculations would require revision.[28] Plaintiffs’ expert expressed no opinion of his own as to the amount of annual loss (if any), to a prospective licensee, realistically attendant upon the presently relevant terms of License No. 5, Montana. He did testify that, in his opinion, the Rocky Mountain Power Company’s method of estimating the annual “loss” which would result from furnishing power to defendant in accordance with the terms of the subsequently issued license was “the more logical and realistic of the two” methods (i.e., Rocky Mountain Power Company’s and that reflected in the 1929 Scatter-good memorandum) utilized in 1929 to estimate annual “loss”. He also testified that the demand-energy method of costing was one recognized and employed in the electric utility industry. He referred to the Wheeler estimate of “loss” only obliquely.
(d) Plaintiffs’ expert testified that both the Rocky Mountain Power Company and Mr. Wheeler were of the view that furnishing power to defendant at “very low rates” would result in a “loss”, and that he thought it was a “question as to whether they would have been willing to have paid the tribes more, had they not had to give up this power * * * a question of logic and deduction.” He felt “that they would have been willing — this is just my opinion — * * * to have paid the tribes more had they not had to furnish this power to the *654 irrigation project.” In response to a question asking the witness’s opinion “on whether, if a hypothetical licensee believed he would suffer an unusual loss on account of furnishing 15,000 horsepower to the Federal Government, it would have any effect on the amount of rentals the licensee would be willing to pay to the Tribes”, plaintiff’s expert stated that in his opinion “it would have a direct effect.”
(e) In response to inquiry as to how much more plaintiffs would have received but for the furnishing of power to defendant, plaintiffs’ expert thought “it would depend primarily upon what they were having to give up, the cost of that to them * * His response to the question whether his testimony indicated such “cost” was that his testimony indicated that the Rocky Mountain Power Company’s computation was a “better measure of that loss than the amount that Mr. Scattergood computed * * He could not “say what amount would have been added to the rentals that were provided for the Indian tribes” had the licensee not been required to furnish power to defendant, nor whether more weight would have been given to the Scattergood estimate of “loss” than to the Rocky Mountain Power Company’s, but he thought that “somewhere in that area an amount would have been reached which reflected the additional rental that the company would have been * * * willing to have paid, or a licensee would have been able to pay.”
(f) Plaintiffs’ expert recognized, but considered of no importance, that any licensee who would incur a “loss” as a result of furnishing power to defendant under the terms of License No. 5, Montana, could “probably * * * recover whatever costs he had under the scheme of regulations to which he was subject * •* he did not think “that fact would influence a prospective licensee.”
(g) Plaintiffs offered no proof in rebuttal.
42. (a) At trial held in July 1970, Mr. Leon D. Spencer and Mr. Robert B. Gallup, whose qualifications as experts in the field of electric power rates were conceded by plaintiffs, appeared as witnesses for defendant. They also jointly prepared a report, subsequently received in evidence, regarding the effect upon Indian rentals of the provision in License No. *655 5, Montana, re furnishing of power to the Flathead Irrigation Project.
(b) Included among the opinions of defendant’s experts were the following:
(1) that any licensee of “the Kerr project would not have experienced a loss because of the necessity to sell at the rates prescribed in the FPC license electric power and energy in the amount of 15,000 horsepower of demand to the Federal Government”; and
(2) that, from a proper analysis of all information actually available in 1929-30, any proposed licensee should have concluded that “the cost of supplying the power to the irrigation project * * * [would be] less than the revenue to be received from the irrigation project for supply of that power, taking pertinent factors into consideration.”
(c) Defendant’s experts further testified that, even were a hypothetical licensee to conclude that he would suffer an annual loss on account of furnishing the 15,000 horsepower to the Flathead Irrigation Project, this conclusion would have no effect upon the amount of rentals such licensee would have been willing to pay to plaintiffs, since any such licensee would have been entitled to earn its full return (then at 8 per cent in Montana) on the Kerr Project on its cost of service, and to include in its cost of service the full cost of furnishing such power; that any loss [29] attendant upon furnishing power to defendant pursuant to the presently relevant terms of License No. 5, Montana, would have been passed on in full to the licensee’s ratepayers and would have had no real impact on the licensee; and that any such loss would have had no effect upon rentals payable to plaintiffs. In their view, any such loss and the amount of rentals payable to plaintiffs were not related in any way.
Ultimate Finding of Fact
43. (a) Plaintiffs urge that the sole issue herein “is the amount of the cost-loss, if any, incurred by the Company *656 from the requirement that it sell the 15,000 horsepower to the Government at the low rates specified in the license”,[30] that a “licensee not burdened with the bargain power requirement would have paid rentals higher by the amount it estimated the requirement would cost it”,[31] and, implicitly, that the Rocky Mountain Power Company’s 1929 estimate (or, alternatively, the 1929 Scattergood estimate) (1) establishes the 'amount of annual “cost-loss” and (2) serves as an accurate measure of the amount by which rentals to plaintiffs would have been increased over the 50-year period of the license.
(b) The record suggests that the “refinements” made by defendant’s experts to the Rocky Mountain Power Company’s and the Scattergood memorandum’s 1929 estimates of loss should not be swallowed whole. However, plaintiffs’ expert, given clear opportunity to testify that (indeed in essence asked directly whether) one or the other of those two 1929 estimates represented the “cost” of what a licensee would have to “give up” in consequence of that requirement, reiterated only that his testimony was that, of the two, the larger estimate of loss was “a better measure of * * * loss” than the smaller one. In view of this, the failure of plaintiffs’ expert witness to furnish his own expert opinion respecting loss (finding 41(c)), and defendant’s expert testimony, it is concluded that plaintiffs have failed to establish by a preponderance of the evidence that a prospective licensee would have anticipated an annual loss in consequence of the requirement for furnishing 15,000 horsepower to defendant at the prescribed rates.
(c) Defendant’s experts testified (and plaintiffs’ expert in substance agreed) that such a loss could be passed on to the licensee’s ratepayers. While the experts disagreed whether that fact would influence a prospective licensee, it is concluded from this record that, assuming a prospective licensee would have anticipated an annual loss in consequence of the requirement for furnishing 15,000 horsepower to defendant *657 at the prescribed rates, plaintiffs have failed to establish by a preponderance of the evidence that such an anticipation would have diminished the rentals payable to plaintiffs but for the said requirement.[32]
(d) The evidence does not establish that the defendant breached its fiduciary obligations to plaintiffs with respect to the negotiation for and the establishment of the presently relevant terms of License No. 5, Montana.
(e) The evidence does not establish “what, if anything”, plaintiffs have lost in consequence of the presently relevant provisions of License No. 5, Montana.
CONCLUSION OB LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover on the claim stated in Paragraph 13 of the petition and as to that claim the petition is dismissed.

Act of July 30, 1946, 60 Stat. 715, quoted in part in finding 1(a). All other claims stated in the petition have now been disposed of.

 See finding 38(c) (4) for the license provisions respecting the 15,000 horsepower here involved. The Rocky Mountain Power Company was a wholly-owned subsidiary of the Montana Power Company. In 193®, License No. 5, Montana, was transferred from subsidiary to parent.

 Plaintiffs still “disagree with the Court’’ as to the proper measure of damages, and "preserve their prior position" on this question. Finding 1(e). Cf. Alabama Power Co. v. Federal Power Commission, 450 F. 2d 716 (C.A.D.C., 1971).

 The first was that, at Federal Power Commission hearings prior to the issuance of License No. 5, Montana, the Rocky Mountain Power Company had estimated an annual out-of-pocket loss of $62,500 from furnishing 15,000 horsepower to defendant on terms and at rates subsequently included in License No. 5, Montana; Assistant Commissioner of Indian Affairs J. Henry Scatter-good had calculated, however, that the annual loss would be “only $25,336”. After reciting these estimates, the court stated:
“* * * the power company probably incurred an annual loss in supplying the 15,000 horsepower to the Federal Government. From that significant fact it would appear, at least prima faole, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed. The serious problem posed by this fact of a substantial annual loss for the licensee on the required sale calls for further exploration to see whether, in fact, the loss on the sale of this block of 16,000 horsepower would have any effect on the rentals payable to the Tribes.”

 Judge Skelton, dissenting, “would * * * dismiss plaintiff’s suit.”

 The Flathead, Mission, and Jocko Valley Irrigation Districts were granted leave by the court to participate as amici curiae in further proceedings before the commissioner if they wished to do so. The Irrigation Districts have been permitted (within limits specified in a Commissioner’s Order filed herein April 22,1970) to participate in such proceedings.

 Confederated Salish and Kootenai Tribes v. United States, supra, 189 Ct. Cl. at 322, 417 F. 2d at 1341.

 Plaintiffs’ expert recognized that “refinements” to the methods need by each could be made, but did not undertake to do so in any depth.

 Mr. Seattergood had expressed a like view In 1929. Plaintiffs’ expert recognized the probability of regulatory recoupment, but thought a prospective licensee would not be Influenced by it.

 Plaintiffs offered no proof by way of rebuttal.

 Nor, assuming a prospective licensee would have anticipated an annual loss In consequence of such a requirement, and some resulting detriment to plaintiffs, have plaintiffs furnished a basis by which the probable amount thereof might reasonably be determined. Cf. Navajo Tribe v. United States, 176 Ct. Cl. 502, 364 F. 2d 820 (1966).

“In order that full justice be done to the Indians, It Is proposed here to consider the case first as if there were only the first three parties [the company; the Indians; the general consumers] and no Irrigation project, and thus to fix the proper Intercompany price for the proforma calculation of the Indian rental; * * 1929 report, p. 32 (fdg. 33).
“The Indian Bureau has the double responsibility of protecting fully the tribal rights of the Indians in the matter of power rentals and also of doing everything possible to mate a success of the Flathead Indian irrigation project committed to Its care. It does not consider that these interests are really conflicting In the sense of the unfortunate dispute above referred to [“an unfortunate dispute on the question of the legality of the irrigation project’s rights”]. We have therefore first considered in this memorandum the matter of the Indian rental on its merits just as if there were no irrigation district at all; we have accordingly proposed what seems to be a fair rate of rental of $2.21 per horsepower * * *. This Indian rate of rental having thus been fixed, we can properly turn to the irrigation project and consider it as one special group of general consumers that the united States Government Is particularly interested in protecting to the extent of 15,000 horsepower for pumping and for the project and for sale.” 1929 report, p. 43 (see fdg. 35 (a) and (b)).
“[Recognition of cheaper power for the project] does not mean, as some friends of the Indians may have feared, that the Indian Bureau does not recognize fully the rights of the Flathead Indian Tribe as the equitable owner of the power sites concerned. These rights are fully recognized and *609 preserved and no precedent to the contrary can be set up from the disposition of this case.” 1929 report, p. 46 (see fdg. 35(e)).
“* * * However, even If the load factors are as the applicant [the company] has estimated and a part Is primary power, we have shown In our memorandum of December 30, 1929 [the first Scattergood report], that after the calculation of the Indian rental, by a slight Increase in the Intercompany price, the small cost of the power will be provided for without In any way affecting the Indian rental.” 1930 report, p. 55 (see fdg. 36(g)).
“It may be added that in all our negotiations regarding the Indian rentals this matter of the Irrigation power was completely ignored. It was recognized by the company’s representatives, as well as by those representing the Government, that at Thompson Falls there will be developed, because of Flathead storage, more than twice as many additional kilowatt-hours than can possibly be used in the entire irrigation 15,000 horsepower demand. Hence, this delivery of this power can and will be provided without the slightest effect in reducing the Indian rental.” 1930 report, p. 55 (see fgd. 36(g)).

 Plaintiffs contend that the various rentals recommended In the Scatter-good reports were between $40,000 and $153,000 per year above the rental later actually established in the license, and that the difference must represent the impact of the cheaper power requirement. We think the premise and conclusion are both inaccurate. Plaintiffs’ figures for the originally-recommended rentals are based upon maximum rentals possible only if the power production far exceeded all predicted levels. As we understand the record, the fixed rentals finally adopted were entirely comparable to (or more than) the various rentals suggested in the earlier stages of the negotiations, Including the rentals Initially proffered by the power company. There is nothing substantial to suggest that the rentals were in fact lowered by the negotiating parties because of the requirement to sell irrigation power.

 The expert testimony at the trial before Commissioner Wood supports this position.

 Plaintiff’s expert (Mr. Van Scoyoe) testified that, In his opinion, the company “would have been willing to have paid the tribes more had they not had to furnish the power to the irrigation project” and that if the company thought it would suffer a loss through the power requirement “it would haye a direct effect” on its wlllingess to pay more in rentals in the absence of the requirement. But these unsupported conclusions are not persuasive, especially in the light of the whole record, either that the company itself thought it would suffer a loss or that if it did so consider that fact would likely affect the rental it was willing to pay. (Mr. Van Scoyoe admitted that the loss would be recouped, but considered that to be immaterial.)
plaintiffs also point to an opinion of the Solicitor’s Office of the Power Commission objecting to the legality of the furnishing of power to the district, but that opinion simply assumes that this sale would necessarily divert revenues away from the Indians; that assumption is not proved or probed in the memorandum. (The Solicitor’s opinion antedated the Scattergood memo-randa which did go in detail into the assumption of diversion of revenues from the Indians.)

 we do not agree with plaintiffs that in the 1928 Act Congress rejected the concept that, even though there was no effect on the Indian rentals, cheaper electricity could be provided for the irrigation district. There is no such prohibition in the Act or suggested by its legislative history. Insofar as the opinion of the Solicitor’s Office of the Federal Power Commission (on which plaintiffs rely) may be thought to suggest otherwise, we think it errs in construing the statute. Insofar as that opinion assumes that the licensee’s obligation to furnish irrigation power would in fact divert revenues from the Indians, the opinion rests on e® parte factual assumptions unsupported by the adversary: record now before the court. See note 15, supra.

 Two minor matters may be noted: (1) Plaintiffs make much of the fact that the commissioner did not observe in his opinion that plaintiffs’ expert (Mr. Van Scoyoc) summarily testified at one point, on inquiry by the commissioner, that the company “did suffer a loss by furnishing this power at the particular rates to the irrigation project.” The opinion does not deny that this was said, but emphasizes, properly, that Mr. Van Scoyoc expressed no opinion of his own as to the amount of the loss and refused to endorse either the Kerr figure or the Scattergood figure. The conclusory statement that a loss was suffered was wholly unsupported by the witness and is not of much help.
(2) Plaintiffs also note that our 1969 opinion (189 Ct. Cl. at 323, 417 F. 2d at 1341-2) said, as one reason for ordering a new trial, “that the present [then] record, defective though it is, does indicate that the power company probably incurred an annual loss in supplying the 15,000 horsepower to the Federal Government [footnote omitted]. From that significant fact it would appear, at least prima facie, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed.” That preliminary observation was made, of course, on the basis of *613 the then record, and was obviously subject to modification In the light of the fuller record expected to be made, and actually made, on the ensuing retrial.

 Plaintiffs presently urge only a breach of fiduciary obligations, not a constitutional talcing. See Confederated Salish and Kootenai Tribes v. United States, 181 Ct. Cl. 739, 743-49 (1967) ; a statutory right to Interest is, however, asserted.

 The court also granted leave to the Flathead, Mission, and Jocko Valley Irrigation Districts to participate as amici curiae In further, proceedings before the commissioner, If they wished to do so, and the Irrigation Districts have been permitted (within specified limits) to participate Ini such proceedings.

 The precise argument Is that only plaintiffs had any Interest In Flathead site No. 1, and that, therefore, “the reservation of the blocks of bargain power by defendant to itself violated [the Act of March 7, 1928, 45 Stat. 200, 212-13], for such action resulted in a taking of a portion of the rental due the Tribes, although In kind and not In cash. Thus, plaintiffs contended and still contend that the value of the power so taken represents the measure of the rental taken.”

 Congress subsequently appropriated further funds for the construction of irrigation systems to irrigate both allotted and unallotted irrigable lands, with similar cost reimbursement language. Act of March 3, 1909, 35 Stat. 781, 795 ($250,000, with $100,000 immediately available) ; Act of April 4, 1910, 36 Stat. 269, 277 ($250,000, with $100,000 immediately available) ; Act of March 3, 1911, 36 Stat. 1058, 1066 ($400,000) ; Act of August 24, 1912, 37 Stat. 518, 526 ($200,000) ; Act of June 30, 1913, 38 Stat. 77, 90 ($325,000) ; Act of August 1, 1914, 38 Stat. 582, 593 ($200,000) ; cf. findings 14, 15,

 A total of 2,452.30 acres was reported to Congress as reserved for power sites.

 This estimate is of 1914 vintage; in 1926, the estimated cost of completing the project, including the cost of connecting the power plant with project towns and farming centers, was $786,550. The project was to be a “run-of-the-river” one, i.e., one whose generation of power would be dependent upon the natural, uncontrolled, flow or “run” of the Flathead River. The power produced was to be used for pumping water from the river to storage reservoirs which, it was anticipated, the Flathead Irrigation Project would need. The tunnel was to be used to divert the river so that a power dam could be constructed at the bend.

 See finding 12(e), Confederated Salish and Kootenai Tribes v. United States, supra 193 Ct. Cl. at 833, 437 F.2d at 476.

 Between 1917 and 1925, Congress subsequently appropriated a total ot some $2,840,000 ior continued construction of the Irrigation systems, with Bimllar cost repayment language.

 Efforts toward the formation of Irrigation districts for the purpose of making such contracts with defendant began very early in 1926. On February 5, 1926, the supervising engineer, united States Indian Irrigation Service, Department of the Interior, forwarded to the Commissioner of Indian Affairs a “proposed contract between the United States and the Flathead Irrigation District * * The accompanying letter stated that “the utmost haste * * * In both the organization of the districts and the completion of the [repayment] contracts” was desirable.

 The proposal reflected that any remainder after “charges made through the Federal Power Commission * * * will probably be divided between the Flathead Indians as a tribe and the united States on account of the irrigation project * * one-third to the tribe and two-thirds to the irrigation project. On May 26, 1927, the Executive Secretary of the Commission advised Senator Thomas J. Walsh that, notwithstanding the “tentative arrangements” between Montana Power Company and the Commissioner of Indian Affairs, “in my opinion, the Commission has no discretion * * * the total of such receipts [of $1.00 per horsepower per annum] would go exclusively to the Indians unless Congress otherwise provides.”

 Original legislative language on tills point was as follows: “rentals from such permits or licenses shall be distributed as provided for In the said Federal water power act * *

 Inter alia, the Executive Secretary stated that the Rocky Mountain Power Company “proposes to provide suitable recognition of the equities of the Flathead Irrigation Project in the power sites, for which your application contains no provision."

 He apparently believed that furnishing an additional 5,000 horsepower at 2% mills would not cause any “cost to the power company * *

 The 1929 memorandum, as reproduced in Senate Document No. 153, 71st Cong., 2d Sess., is 47 pages long.

He also noted that the Flathead power development was “the first important one upon an Indian reservation wherein power is the controlling factor”, and that it was therefore “of great importance to the Indians in establishing principles.”

 This “subject has no bearing [on Mr. Wheeler] because he sets up only one company * * -with an “output price wholesale at $15 per horsepower.” The Rocky Mountain Power Company proposed to sell to the Montana Power Company at $18 per horsepower-year.

 The memorandum Indicated that the Thompson Palls “Increase because of Flathead storage would add $1.08 per horsepower-year to the Montana Power Co.’s system * * * [It] Is not claimed here as available for the Indian rental * * * It is an element that must enter Into the calculation of the interests of the general public and of the Irrigation project In particular."

 This result was derived by figuring 50 per cent of $4.49 (finding 34(b)), 50 per cent of $4.33 (finding 34(b)), and then taking “the mean of these two calculations * * The “full annual earning power of site No. 1 for the Indians * * using a prime power of 80,500 horsepower (finding 34(b)) was thus computed at “$177,905 per annum.” The computation assumed “the actual development of the estimated prime power.”

 One mill per kilowatt hour delivered for up to 10,000 horsepower, and 2% mills per kilowatt hour for up to 5,000 additional horsepower. See finding 22(b).

 Rocky Mountain. Power Company’s initial “oSer” was $1.00 per horsepower-year, or, on its estimated prime power capacity of 68,000 horsepower, $68,000 per year; Mr. Wheeler’s was $1.1250 per horsepower-year, or, on his estimated prime power capacity of 95,000 horsepower, $106,875 per year. Mr. Scattergood’s computations resulted in a figure of $177,905 per year.

 This method was also described as utilizing “a rate per horsepower and estimated at a ‘spot’ of production.” The initial “offers” of both the Rocky Mountain Power Company and Mr. Wheeler had been so calculated, as had the 1929 Scattergood memorandum estimate. Finding 35(f).

 The agreed upon rental scale appears in finding 38(b).

 Paragraph (D), Article 30, provided in part that annual charges might be readjusted at the end of 20 years “after the beginning of operation » * * and at periods of not less than ten (10) years thereafter » *

 The 1929 Scattergood memorandum also expressed the view that even this “loss” could be recouped. Finding 35(d). See also finding 36(g).

 Each of these calculations utilizes a figure of 5,000 horsepower for the period June 1, 1934 to May 19, 1939, and a figure of 15,000 horsepower for the period May 20, 1939 to May 22, 1980.

 In August 1939, the license was transferred from the Rocky Mountain Power Company to the Montana Power Company.

 Plaintiffs’ Requested Findings of Fact (1) state that the four calculations employ a compound interest discount factor, and (2) include two further calculations purportedly utilizing a simple interest discount factor of 4 per cent. The asserted impact is to increase the amounts in (1) and (2) above to, respectively, $1,351,180 and $556,945.

 Plaintiffs’ expert recognized that “Of course, there can be refinements made of these two basic methods”, but did not undertake to do so in any depth. Defendant’s experts, who did make extensive “refinements”, concluded that no loss would have resulted from the presently relevant terms of License No. 5, Montana. Finding 42(b). See also finding 36(g).

 In their opinion, however, none would have been experienced. Finding 42(b).

 Plaintiffs’ Requested Findings of Fact, p. 5; Plaintiffs’ Reply to Joint Objections to Plaintiffs’ Requested Findings of Fact, p. 134.

 Plaintiffs’ Requested Finding 37.

 Assuming both an anticipated annual loss, and a resulting diminution of the rentals otherwise payable to plaintiffs, no basis by which the probable amount of such diminution might reasonably be determined has been furnished.